MAYER, Circuit Judge,
concurring.
I agree that the claims asserted by Ultramercial, Inc. and Ultramercial, LLC (together, “Ultramercial”) are ineligible for a patent, but write separately to emphasize three points. First, whether claims meet the demands of 35 U.S.C. § 101 is a threshold question, one that must be addressed at the outset of litigation. Second, no presumption of eligibility attends the section 101 inquiry. Third, Alice Corporation v. CLS Bank International, — U.S. -, 134 S.Ct. 2347, 2356-59, 189 L.Ed.2d 296 (2014), for all intents and purposes, set out a technological arts test for patent eligibility. Because the purported inventive concept in Ultramercial’s asserted claims is an entrepreneurial rather than a technological one, they fall outside section 101.
I.
The Constitution’s Intellectual Property Clause is at once a grant of power and a restriction on that power. Graham v. John Deere Co., 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Aee also In re Yuan, 38 CCPA 967, 188 F.2d 377, 380 (1951) (explaining that the constitutional grant of authority to issue patents “is the only one of the several powers conferred upon the Congress which is accompanied by a specific statement of the reason for it”). Unless we are to assume that the constraints explicit in the Intellectual Property Clause are mere surplusage, we are bound to ensure that the patent monopoly serves “[t]o promote the Progress *718 of Science and useful Arts,” U.S. Const, art. I, § 8, cl. 8. “This is the standard expressed in the Constitution and it may not be ignored.” Graham, 383 U.S. at 6, 86 S.Ct. 684.
Section 101 is the gateway to the Patent Act for good reason. It is the sentinel, charged with the duty of ensuring that our nation’s patent laws encourage, rather than impede, scientific progress and technological innovation. See Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 1301, 182 L.Ed.2d 321 (2012) (emphasizing that patent protection may not “foreclose[] more future invention than the underlying discovery could reasonably justify”); Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 511, 37 S.Ct. 416, 61 L.Ed. 871 (1917) (explaining that “the primary purpose” of the patent system is to promote scientific progress, not to “creat[e] ... private fortunes for the owners of patents”). The Supreme Court has thus dictated that section 101 imposes “a threshold test,” Bilski v. Kappos, 561 U.S. 593, 602, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), one that must be satisfied before a court can proceed to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate written description under 35 U.S.C. § 112. See Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Flook”) (“The obligation to determine what type of discovery is sought to be patented” so as to determine whether it falls within the ambit of section 101 “must precede the determination of whether that discovery is, in fact, new or obvious.”). This court has likewise correctly recognized that subject matter eligibility is the primal inquiry, one that must be addressed at the outset of litigation. See In re Comiskey, 554 F.3d 967, 973 (Fed.Cir.2009) (“Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for patentability, such as novelty under § 102 and ... non-obviousness under § 103.” (citations and internal quotation marks omitted)); State St. Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d 1368, 1372 n. 2 (Fed.Cir.1998) (Section 101 is “[t]he -first door which must be opened on the difficult path to patentability.” (citations and internal quotation marks omitted)).
In this sense, the section 101 determination bears some of the hallmarks of a jurisdictional inquiry. Just as a court must assure itself of its own jurisdiction before resolving the merits of a dispute, see Diggs v. Dep’t of Hous. & Urban Dev., 670 F.3d 1353, 1355 (Fed.Cir.2011), it must likewise first assess whether claimed subject matter is even eligible for patent protection before addressing questions of invalidity or infringement. If a patent is not directed to “the kind of discover[y]” that the patent laws were intended to protect, Flook, 437 U.S. at 593, 98 S.Ct. 2522 (1978) (internal quotation marks omitted), there is no predicate for any inquiry as to whether particular claims are invalid or infringed. Indeed, if claimed subject matter does not fall within the ambit of section 101, any determination on validity or infringement constitutes an impermissible advisory opinion. See Oil, Chem. & Atomic Workers Int’l Union v. Missouri, 361 U.S. 363, 367, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960) (emphasizing that federal courts are to decide only “actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions” (citations and internal quotation marks omitted)).
From a practical perspective, addressing section 101 at the outset of litigation will have a number of salutary effects. First, it will conserve scarce judicial resources. Failure to recite statutory subject matter is the sort of “basic deficiency,” that can, *719 and should, “be exposed at the point of minimum expenditure of time and money by the parties and the court,” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations and internal quotation marks omitted). Here, for example, the district court properly invoked section 101 to dismiss Ultramercial’s infringement suit on the pleadings. No formal claim construction was required because the asserted claims disclosed no more than “an abstract idea garnished with accessories” and there was no “reasonable construction that would bring [them] within patentable subject matter.” Ultramercial, LLC v. Hulu, LLC, No. 09-CV-6918, 2010 WL 3360098, at *6 (CD.Cal. Aug. 13, 2010).
Second, resolving subject matter eligibility at the outset provides a bulwark against vexatious infringement suits. The scourge of meritless infringement claims has continued unabated for decades due, in no small measure, to the ease of asserting such claims and the enormous sums required to defend against them. Those who own vague and overbroad business method patents will often file “nearly identical patent infringement complaints against a plethora of diverse defendants,” and then “demand ... a quick settlement at a price far lower than the cost to defend the litigation.” Eon-Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1326 (Fed.Cir.2011). In many such cases, the patentee will “place[] little at risk when filing suit,” whereas the accused infringer will be forced to spend huge sums to comply with broad discovery requests. Id. at 1327 (noting that accused infringers are often required “to produce millions of pages of documents, collected from central repositories and numerous document custodians”). Given the staggering costs associated with discovery, “Markman ” hearings, and trial, it is hardly surprising that accused infringers feel compelled to settle early in the process. See id. (noting that the accused infringer had “expended over $600,000 in attorney fees and costs to litigate [the] case through claim construction”); see also Cardinal Chem. Co. v. Morton Int’l, Inc., 508 U.S. 83, 101 n. 24, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), (explaining that “prospective defendants will often decide that paying royalties under a license or other settlement is preferable to the costly burden of challenging [a] patent” (citations and internal quotation marks omitted)). Addressing section 101 at the threshold will thwart attempts-some of which bear the “ ‘indicia of extortion,’ ” Eon-Net, 653 F.3d at 1326 — to extract “nuisance value” settlements from accused infringers. Id. at 1327; see also id. at 1328 (explaining that the asserted patents “protected only settlement receipts, not ... products”).
Finally, and most importantly, turning to section 101 at the outset protects the public. See Cardinal Chem., 508 U.S. at 101, 113 S.Ct. 1967 (emphasizing the public interest in preventing the “grant [of] monopoly privileges to the holders of invalid patents” (footnote omitted)). Subject matter eligibility challenges provide the most efficient and effective tool for clearing the patent thicket, weeding out those patents that stifle innovation and transgress the public domain. As a general matter, trial courts have broad discretion in controlling their dockets and in determining the order in which issues are to be adjudicated. But the public interest in eliminating defective patents is an “even more important countervailing concerní ],” Cardinal Chem., 508 U.S. at 99, 113 S.Ct. 1967, which counsels strongly in favor of resolving subject matter eligibility at the threshold of litigation. Indeed, it was this impulse which impelled the Supreme Court to insist that this court address invalidity claims, notwithstanding a finding of no infringement. Id. at 99-101, 113 S.Ct. 1967. The need for early *720 resolution of eligibility is even more compelling. See Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234, 12 S.Ct. 632, 36 L.Ed. 414 (1892) (“It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly.”).
II.
The Supreme Court has taken up four subject matter eligibility challenges in as many years, endeavoring to right the ship and return the nation’s patent system to its constitutional moorings. See Alice, 134 S.Ct. at 2357 (concluding that “generic computer implementation” did not bring claims within section 101); Ass’n for Molecular Pathology v. Myriad Genetics, Inc., — U.S. -, 133 S.Ct. 2107, 2117-18, 186 L.Ed.2d 124 (2013) (“Myriad”) (concluding that claims covering naturally-occurring DNA segments were patent ineligible); Mayo, 132 S.Ct. at 1302 (concluding that claims describing a natural law but “add[ing] nothing of significance” to that law fell outside section 101); Bilski, 561 U.S. at 611, 130 S.Ct. 3218 (concluding that a method for hedging against economic risk was a patent ineligible abstract idea). Rejecting efforts to treat section 101 as a “dead letter,” Mayo, 132 S.Ct. at 1303, the Court has unequivocally repudiated the overly expansive approach to patent eligibility that followed in the wake of State Street, 149 F.3d at 1373. See Bilski, 561 U.S. at 659, 130 S.Ct. 3218 (Breyer, J., concurring in the judgment) (explaining that State Street “preceded the granting of patents that ranged from the somewhat ridiculous to the truly absurd” (citations and internal quotation marks omitted)).
The rationale for the presumption of validity is that the United States Patent and Trademark Office (“PTO”), “in its expertise, has approved the claim.” KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398, 426, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). That rationale, however, is “much diminished” in situations in which the PTO has not properly considered an issue. Id. Because the PTO has for many years applied an insufficiently rigorous subject matter eligibility standard, no presumption of eligibility should attach when assessing whether claims meet the demands of section 101.
Indeed, applying a presumption of eligibility is particularly unwarranted given that the expansionist approach to section 101 is predicated upon a misapprehension of the legislative history of the 1952 Patent Act. Those who support a “coarse filter” approach to section 101 often argue that the Act’s legislative history demonstrates that Congress intended statutory subject matter to “include anything under the sun that is made by man.” See, e.g., AT & T Corp. v. Excel Commc’ns, Inc., 172 F.3d 1352, 1355 (Fed.Cir.1999). Read in context, however, the legislative history says no such thing. See Mayo, 132 S.Ct. at 1303-04. The full statement from the committee report reads: “A person may have ‘invented’ a machine or a manufacture, which may include anything under the sun that is made by man, but it is not necessarily patentable under section 101 unless the conditions of the title are fulfilled.” H.R.Rep. No.1923, 82d Cong., 2d Sess., at 6 (1952), 1952 U.S.C.C.A.N. 2394, 2399 (emphasis added). Thus, far from supporting an expansive approach to section 101, the relevant legislative history makes clear that while a person may have “invented” something under the sun, it does not qualify for patent protection unless the Patent Act’s statutory requirements have been satisfied.
Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned — much less *721 applied — any presumption of eligibility. The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, see Microsoft Corp. v. i4i Ltd. P’ship, — U.S. -, 131 S.Ct. 2238, 2243-47, 180 L.Ed.2d 131 (2011), no equivalent presumption of eligibility applies in the section 101 calculus.
III.
Alice recognized that the patent system does not extend to all products of human ingenuity. 134 S.Ct. at 2358-60; see also Myriad, 133 S.Ct. at 2117 (“Groundbreaking, innovative, or even brilliant discovery does, not by itself satisfy the § 101 inquiry.”). Because the system’s objective is to encourage “the onward march of science,” O’Reilly v. Morse, 56 U.S. (15 How.) 62, 113, 14 L.Ed. 601 (1853), its rewards do not flow to ideas — even good ones — outside of the technological arena.
In Alice, the claimed intermediated settlement technique was purportedly new and useful, but the Supreme Court nonetheless unanimously concluded that it fell outside section 101.[1] 134 S.Ct. at 2358-59. The problem was not that the asserted claims disclosed no innovation, but that it was an entrepreneurial rather than a technological one. In effect, Alice articulated a technological arts test for patent eligibility, concluding that the asserted method and system claims were patent ineligible because they did not “improve the functioning of the computer itself’ or “effect an improvement in any other technology or technical field.” Id. at 2359; see also id. at 2358 (explaining that the claims in Diamond v. Diehr, 450 U.S. 175, 177-79, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) X‘Diehr”), were patentable because they disclosed an “improve[ment]”' to a “technological process”). In assessing patent' eligibility, advances in non-technological disciplines — such as business, law, or the social sciences — simply' do not count.
In Bilski, the Supreme Court recognized that “business method patents raise special problems in terms of vagueness and suspect validity,” 561 U.S. at 608, 130 S.Ct. 3218, but it declined.to hold “that business methods are categorically outside of § 101’s scope,” id. at 607, 130 S.Ct. 3218. Notably, however, it invited this court to fashion a rule defining a “narrower category” of patent-ineligible claims directed to methods of conducting business. See id. at 608-09, 130 S.Ct. 3218 (“[I]f the Court of Appeals were to succeed in defining a narrower category or class of patent applications that claim to instruct how business should be conducted, and then rule that the category is unpatentable because, for instance, it represents an attempt to patent abstract ideas, this conclusion might well be in accord with controlling precedent.”). A rule holding that claims are impermissibly abstract if they are directed to an entrepreneurial objective, such as methods for increasing revenue, minimiz- • ing economic risk, or structuring commercial transactions, rather than a technological one, would comport with the guidance provided in both Alice and Bilski.
To satisfy the technological arts test, claims must harness natural laws and scientific principles — those “truth[s] about the natural world that ha[ve] always existed,” Alice, 134 S.Ct. at 2356 (citations and internal quotation marks omitted) — and *722 use them to solve seemingly intractable problems. They must, moreover, not only describe a technological objective, but set out a precise set of instructions for achieving it.[2] An idea is impermissibly “abstract” if it is inchoate — unbounded and still at a nascent stage of development. It can escape the realm of the abstract only through concrete application. Mackay Radio & Tel. Co. v. Radio Corp., 306 U.S. 86, 94, 59 S.Ct. 427, 83 L.Ed. 506 (1939) (“While a scientific truth, or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be.”). This concrete application is new technology — taking a scientific principle or natural law and “tying it down” by implementing it in a precisely defined manner. See Mayo, 132 S.Ct. at 1302 (rejecting claims, in part, because they did “not confine their reach to particular applications”). The claims in Diehr, 450 U.S. at 187, 101 S.Ct. 1048, for example, were deemed patent eligible because they provided a clearly delineated set of instructions for carrying out a new technique for .curing rubber and their reach was confined to a particular industrial application.
Precise instructions for implementing an idea confine the reach of a patent, ensuring that the scope of the claims is commensurate with their technological disclosure. In assessing patent eligibility, “the underlying functional concern ... is a relative one: how much future innovation is foreclosed relative to the contribution of the inventor.” Mayo, 132 S.Ct. at 1303; see Motion Picture Patents, 243 U.S. at 513, 37 S.Ct. 416 (“[T]he inventor [is entitled to] the exclusive use of just what his inventive genius has discovered. It is all that the statute provides shall be given to him and it is all that he should receive, for it 'is the fair as well as the statutory measure of his reward for his contribution to the public stock of knowledge.”). At its core, the technological arts test prohibits claims which are “overly broad,” Mayo, 132 S.Ct. at 1301, in proportion to the technological dividends they yield.
IV.
Ultramercial’s asserted claims fall short of Alice’s technological arts test.. Their purported inventive concept is that people will be willing to watch online advertise.ments in exchange for the opportunity to view copyrighted materials. See U.S. Patent No. 7,346, 545 col.8 11.5-48. Because the innovative aspect of the claimed invention is an entrepreneurial rather than a technological one, it is patent ineligible.
The fact that the asserted claims “require a substantial and meaningful role for the computer,” Alice, 134 S.Ct. at 2359 (citations and internal quotation marks omitted), is insufficient to satisfy the technological arts test, It is not that generic computers and the Internet are not “tech *723 nology,” but instead that they have become indispensable staples of contemporary life. Because they are the basic tools of modern-day commercial and social interaction, their use should in general remain “free to all men and reserved exclusively to none,” Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948); see Alice, 134 S.Ct. at 2354 (“[M]onopolization of [the basic tools of scientific and technological work] through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws.” (citations and internal quotation marks omitted)); Graham, 383 U.S. at 6, 86 S.Ct. 684 (“Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to' restrict free access to materials already available.”). Accordingly, claims like those asserted by Ultramercial, which “simply instruct the practitioner to implement [an] abstract idea ... on a generic computer,” Alice, 134 S.Ct. at 2359, do not pass muster under section 101.

. The Court noted that "the concept of -intermediated settlement is a fundamental economic practice long prevalent in our system of commerce.” Alice, 134 S.Ct. at 2356 (citations and internal quotation marks omitted). But whether the "concept” of intermediated settlement is an abstract idea is a wholly different question from whether the claimed invention provided a useful and innovative application of that concept.

. Some charge that if patent eligibility turns on -the disclosure of technology that is both ''new” and clearly delineated, section 101 will subsume the non-obviousness and adequate written description inquiries set out in subsequent sections of the Patent Act. The simple fact, however, is that this court’s approach to sections 103 and 112 has proved woefully inadequate in preventing a deluge of very poor quality patents. See, e.g., Gerard N. Magliocca, Patenting the Cuive Ball: Business Methods & Industry Norms, 2009 BYU L.Rev. 875, 900 (2009) (”[T]here is no evidence that relying on §§ 102, 103, or 112 will solve the problem [of poor quality business method and. software patents]. This claim was made ten years ago. It is still being made now. At what point does this argument run out of credibility?” (footnote omitted)). Section 101’s vital role — a role that sections 103 and 112 "are not equipped” to take on, Mayo, 132 S.Ct. at 1304 — is to cure systemic constitutional infirmities by eradicating those patents which stifle technological progress and unjustifiably impede the free flow of ideas and information.